THOMAS F. MULLIGAN, Appellant, v. JOLIET RE-
GIONAL PORT DISTRICT et al., Appellees.

*Opinion filed August 22, 1988.*

304

STAMOS, J., took no part.

Donald L. Wennlund & Associates, of New Lenox (Donald L. Wennlund and Michael R. Puhl, of counsel), for appellant.

Louis R. Bertani, of Herschbach, Tracy, Johnson, Bertani & Wilson, of Joliet, for appellee Joliet Regional Port District.

J. Gerald Bambrick, Jr., and Joseph E. McNitt, of Pope, Ballard, Shepard & Fowle, Ltd., of Chicago, for appellee Lewis University.

James P. Nally, of Rallo & Tepper, of Chicago, Special Assistant Attorney General, for appellee Division of Aeronautics, Department of Transportation.

JUSTICE CLARK delivered the opinion of the court:

This is an appeal from the judgment of the circuit court of Will County denying the plaintiff's request for declaratory relief seeking to prevent the Joliet Regional Port District (hereinafter Port District) from proceeding with its acquisition, operation, and expansion of Lewis University's airport facility without first receiving referendum approval from the voters of the Port District as required by an amendment (Pub. Act 83—1102) to the Port District's enabling act. (See Ill. Rev. Stat. 1985, ch. 19, par. 254.6.) In rendering its ruling the trial court also dismissed the Port District's counterclaim, which challenged the constitutionality of Public Act 83—1102 as special legislation in violation of article IV, section 13, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, §13). The defendant filed a cross-appeal from the portion of the trial court's order dismissing its counterclaim. We allowed a direct appeal to be taken to this court under Rule 302(b) (107 Ill. 2d R. 302(b)).

At the hearing before the trial court, as well as in their appeal and cross-appeal before this court, the parties have stipulated to the relevant facts governing this dispute. Those facts are as follows.

The Joliet Regional Port District was created in 1957 by an act of the Illinois General Assembly (see Ill. Rev. Stat. 1957, ch. 19, par. 251 *et seq.*) which granted the Port District the power to locate, establish, and maintain a public airport and associated facilities within its corporate boundaries. The act also provided the Port District with the power to construct, develop, expand, extend and improve the airport. Pursuant to this grant of authority, the Port District began in 1980 to study the possibility of locating an airport facility within its corporate limits. It expended funds on studies and surveys and commenced dealing with Lewis University concerning the acquisition of the Lewis University airport. Following extensive negotiations, the Port District formalized the location, establishment and maintenance of the Lewis University airport as its public airport by a resolution passed at the meeting of the board of the Port District on December 28, 1983. On December 30, 1983, the Port District entered into a sale agreement with Lewis University relating to the Port District's purchase of the Lewis University airport. This agreement was later amended on June 14, 1984.

During the early part of 1983, at approximately the same time the Port District was conducting its negotiations with Lewis University, House Bill 2244 was introduced in the Illinois legislature. House Bill 2244, as it was later amended in the Illinois Senate, provided that the power of the Joliet Regional Port District to locate, establish and maintain a public airport, and to construct, develop, expand, extend and improve an airport, as set forth pursuant to the Joliet Regional Port District Act (Ill. Rev. Stat. 1981, ch. 19, par. 254.6), could be exer-

cised only with the approval of the voters of the Port District by a referendum.

The essential progression of House Bill 2244, which eventually became Public Act 83—1102, was as follows. House Bill 2244 was originally passed by the Illinois House of Representatives on March 27, 1983. On June 27, 1983, it was passed by the Illinois Senate in its amended form, containing the referendum provision. On June 29, 1983, the House concurred in the Senate amendment. The bill was then sent to the Governor, who, on September 24, 1983, returned it to the General Assembly with special recommendations for change, in accordance with the amendatory veto procedures set forth in section 9(e) of article IV of the Illinois Constitution of 1970. On October 19, 1983, the House accepted the Governor's specific recommendations for change to House Bill 2244, and the Senate did likewise by record vote on November 1, 1983. The bill was returned to the Governor on November 7, 1983, for certification. On January 5, 1984, the Governor certified that the General Assembly's acceptance of the bill conformed to his specific recommendations for change, and it became law, commonly known as Public Act 83—1102.

The record here reveals that the plaintiff filed his complaint for declaratory relief on August 23, 1985, to prevent the Port District from proceeding with its plans to purchase the Lewis University airport without first seeking referendum approval from the voters within the Port District. In his complaint the plaintiff asked the court to find that Public Act 83—1102 became effective on January 5, 1984. The Port District thereafter filed its counterclaim on July 1, 1986, challenging the constitutionality of the referendum amendment provision of Public Act 83—1102 as special legislation.

After hearing counsels' arguments, the trial court found that Public Act 83—1102 did not become effective

until July 1, 1984, and that the Port District had done everything necessary to exercise its authority to acquire, operate and expand the Lewis University airport prior to the effective date of the amendment requiring the referendum. The trial court declined to consider the constitutionality of Public Act 83—1102 and dismissed the defendant's counterclaim. The parties thereafter filed their appeals in this court.

Three issues are presented for our review in the instant case: (1) the effective date of Public Act 83—1102; (2) whether the Port District exercised its power to acquire, operate and expand the Lewis University airport prior to the effective date of Public Act 83—1102; and (3) whether the legislative amendment to the Joliet Regional Port District Act (Ill. Rev. Stat. 1983, ch. 19, par. 254.6), as contained in Public Act 83—1102, violates the provisions of article IV, section 13, of the Illinois Constitution of 1970 as special legislation.

We first turn our attention to the question concerning the effective date of Public Act 83—1102, which became law through the amendatory veto process. (See Ill. Const. 1970, art. IV, §9(e).) The plaintiff here asserts that Public Act 83—1102 took effect on January 5, 1984, whereas the defendant asserts that July 1, 1984, is the Act's effective date.

The constitutional provisions relating to the effective dates of laws are found in section 10 of article IV of the Illinois Constitution of 1970. Article IV, section 10, directs the General Assembly to "provide by law for a uniform effective date for laws *passed prior to July 1* of a calendar year." (Emphasis added.) Section 10 further provides that bills "*passed after June 30* shall not become effective prior to July 1 of the next calendar year unless the General Assembly by the vote of three-fifths of the members elected to each house provides for an earlier effective date." (Emphasis added.) The purpose

of determining the effective date of an act according to the date of passage is to afford the public adequate notice of the contents of the enactment. *City of Springfield v. Allphin* (1978), 74 Ill. 2d 117, 130.

In response to the constitutional mandate contained in article IV, section 10, the General Assembly enacted "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1983, ch. 1, par. 1201 *et seq.*). As amended, sections 1(a) and 2 of that act provide in pertinent part as follows:

"§1. (a) A bill *passed prior to July 1* of a calendar year that does not provide for an effective date in the terms of the bill shall become effective on January 1 of the following year, or upon its becoming law, whichever is later." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 1, par. 1201(a).

"§2. A bill *passed after June 30* of a calendar year shall become effective on July 1 of the next calendar year unless the General Assembly by a vote of three-fifths of the members elected to each house provides for an earlier effective date in the terms of the bill or unless the General Assembly provides for a later effective date in the terms of the bill; provided that if the effective date provided in the terms of the bill is prior to the date the bill becomes a law then the date the bill becomes a law shall be the effective date." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 1, par. 1202.

Reading these constitutional and statutory provisions together, we find that there is direct correlation between a law's effective date and its date of passage. Quite clearly, then, the key to understanding the effective date of laws in Illinois is to know the meaning of the term "passed."

In *People ex rel. Klinger v. Howlett* (1972), 50 Ill. 2d 242, this court held that a bill which had been the subject of an amendatory veto by the Governor, pursuant to section 9(e) of article IV of the Illinois Constitution of

1970, did not "pass" until the legislature had approved the Governor's specific recommendations. In referring to its earlier decision in *Board of Education v. Morgan* (1925), 316 Ill. 143, the *Klinger* court defined the term "passed" as used in section 10 of article IV of the Illinois Constitution of 1970 as follows:

> "Read as a whole, the opinion in *Morgan* defines the time when a bill is passed as *the time of the last legislative act necessary so that the bill would become law upon its acceptance by the Governor without further action by the legislature.* We continue to adhere to this definition." (Emphasis added.) (50 Ill. 2d at 247.)

The court further held that the approval of the Governor's recommended amendments to the language previously adopted by the legislature was just such a "legislative act," before which no bill may be said to have "passed." The court reasoned that "[a]ny other definition of the word 'passed' which fixed an earlier time would require this court to rule that the bills were passed before the legislature ever considered them in their final form, indeed before they were written." 50 Ill. 2d at 248.

Subsequent to *Klinger*, the legislature defined the word "passed" for purposes of determining the effective date of laws as follows:

> "[A] bill is 'passed' at the time of its final legislative action prior to presentation to the Governor pursuant to paragraph (a) of Section 9 of Article IV of the Constitution." Ill. Rev. Stat. 1983, ch. 1, par. 1203.

Section 9 of article IV of the Illinois Constitution of 1970 provides for the veto powers of the Governor. The provisions of section 9 pertinent to this appeal are as follows:

> "(a) Every bill *passed* by the General Assembly shall be presented to the Governor within 30 calendar days after its *passage.* The foregoing requirement shall be judi-

cially enforceable. *If the Governor approves the bill, he shall sign it and it shall become law.*

\* \* \*

(e) *The Governor may return a bill together with specific recommendations for change to the house in which it originated. The bill shall be considered in the same manner as a vetoed bill but the specific recommendations may be accepted by a record vote of a majority of the members elected to each house. Such bill shall be presented again to the Governor and if he certifies that such acceptance conforms to his specific recommendations, the bill shall become law. If he does not so certify, he shall return it as a vetoed bill to the house in which it originated."* (Emphasis added.)

In his appeal before this court, the plaintiff here asserts that the legislature's statutory definition of "passed" as contained in section 3 of "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1983, ch. 1, par. 1203), which was adopted subsequent to this court's decision in *Klinger*, effectively abrogated the holding in *Klinger*. It is the plaintiff's position then that "the final legislative action," as defined in section 3, occurred June 29, 1983, when the House passed the Senate's amended version of the original bill. Accordingly, the plaintiff argues that Public Act 83—1102 "passed" prior to July 1, 1983, and therefore, in accordance with article IV, section 10, of the Illinois Constitution of 1970 and section 1 of "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1983, ch. 1, par. 1201), the Act became effective on its January 5, 1984, certification date.

The defendant, on the other hand, argues that a bill that is the subject of an amendatory veto under article IV, section 9(e), of the Constitution of 1970, such as House Bill 2244, is not "passed" for purposes of determining its effective date until the final vote approving the Governor's recommended changes is taken in the

General Assembly. Accordingly, it is the defendant's position that Public Act 83—1102 was not "passed" by the General Assembly until November 1, 1983, the date the Senate voted to accept the Governor's recommendations for change after the House of Representatives had already done so. The defendant argues, therefore, that pursuant to section 10 of article IV of the Constitution of 1970 and section 2 of "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1983, ch. 1, par. 1202), Public Act 83—1102 was not effective until July 1, 1984.

The question as to whether the original passage or later acceptance of an amendatorily vetoed bill is the "passage date" for the effective date of laws provision has been the subject of much debate. (See Purano, *Effective Date of New Laws—A Dangerous & Unnecessary Hiatus*, 69 Ill. B.J. 216 (1980); Dillard & Martin, *Effective Dates of Laws "Passed" by the Illinois General Assembly*, 73 Ill. B.J. 434 (1985).) In deciding this issue, we are faced with two possible resolutions. First, we must attempt to harmonize the statutory definition of "passed" set forth in section 3 of "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1983, ch. 1, par. 1203) with the constitutional definition of "passed" as set forth in article IV, section 10, of the Constitution of 1970 as construed by this court in *Klinger*. In this way the effectiveness of section 3 would be preserved. Should we, however, determine that section 3 cannot be harmonized with article IV, section 10, and *Klinger*, then we must declare section 3 unconstitutional. However, as between two possible constructions of a statute, one rendering it as constitutional, and the other as unconstitutional, this court will favor the construction rendering it constitutional. *Time, Inc. v. Hulman* (1964), 31 Ill. 2d 344.

Several rules of statutory construction are relevant to the disposition of this appeal. (*Illinois National Bank v. Chegin* (1966), 35 Ill. 2d 375, 378.) Where the language of

a statute admits of two constructions, one of which would make the enactment absurd and illogical, while the other renders it reasonable and sensible, the construction which leads to an absurd result must be avoided. (35 Ill. 2d at 378; see also 2A A. Sutherland, Statutory Construction §45.12 (4th ed. 1984).) A proper interpretation of a provision cannot simply be based on its language; it must be grounded on the "nature, objects and the consequences that would result from construing it one way or the other." (*Carrigan v. Illinois Liquor Control Comm'n* (1960), 19 Ill. 2d 230, 233.) Statutes must be construed in the most beneficial way which their language will permit so as to prevent hardship or injustice, and to oppose prejudice to public interests. See *Illinois National Bank v. Chegin* (1966), 35 Ill. 2d 375.

We find here that the phrase "final legislative action prior to presentation to the Governor pursuant to paragraph (a) of Section 9 of Article IV of the Constitution," as contained in section 3 of "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1983, ch. 1, par. 1203), is capable of several different constructions depending on a bill's particular legislative history. "[F]inal legislative action prior to presentation to the Governor pursuant to paragraph (a) of Section 9 of Article IV," which determines when a bill is "passed," could mean any one of the following: (1) passage on the third reading in the second house; (2) concurring in or receding from an amendment; (3) adoption of a conference committee report; or (4) *acceptance of the Governor's specific recommendations for change pursuant to his amendatory veto power.* Construing section 3 in accordance with these first three situations would mean that, under these circumstances, a bill's "passage" date would be on or before June 30, and an act's effective date would then be January 1 of the following year, unless the General Assembly specified otherwise. (See Ill. Rev.

Stat. 1983, ch. 1, par. 1201.) However, under the fourth possible construction of section 3 set forth above, the result would be quite different.

As previously noted, the court in *Klinger*, in attempting to determine the effective date of a bill that the Governor had returned to the General Assembly for change pursuant to his amendatory veto powers, defined "the time of passage" of a bill as "the time of the last legislative act necessary so that the bill would become law upon its acceptance by the Governor without further action by the legislature." (*Klinger*, 50 Ill. 2d at 247.) The *Klinger* court expressed its concern that under any other alternative definition of the term "passed," an amendatorily vetoed bill could be considered passed before it is in final form. The court stated:

"In the present situation the last act of the legislature which permitted the Governor to make the bills become law by his acceptance was the vote of the houses of the General Assembly which approved the Governor's changes in the bills. For the purpose of section 10 of article IV, these bills were 'passed' on October 28, 1971, when the House voted to accept the Governor's executive amendment after the Senate had already done so. Any other definition of the word 'passed' which fixed an earlier time would require this court to rule that the bills were passed before the legislature ever considered them in their final form, indeed before they were written. Nothing in the constitution of 1970 suggested that the word 'passed' was used in such an artificial and abnormal sense." 50 Ill. 2d at 247-48.

In the instant case, the last legislative act necessary so that House Bill 2244 could become law took place on November 1, 1983, when the Senate voted to accept the Governor's recommendations for change after the House of Representatives had already done so. It was at this point that no further legislative action was required. Thus, for the purpose of section 10 of article IV of the

Constitution of 1970 this bill was "passed" on November 1, 1983. Pursuant to section 9(e) of article IV of the Constitution, the Governor's certification on January 5, 1984, that the General Assembly had accepted his recommendations for change allowed Public Act 83—1102 to become law. In accordance with section 10 of article IV of the Constitution and section 2 of "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1983, ch. 1, par. 1202), therefore, Public Act 83—1102 became effective on July 1, 1984.

By construing section 3 of "An Act in relation to the effective date of laws" so that "final legislative action prior to presentation to the Governor pursuant to paragraph (a) of Section 9 of Article IV," includes the time when the General Assembly accepts the Governor's specific recommendations for change, section 3 is brought into harmony with section 10 of article IV of the Constitution and this court's opinion in *Klinger*, thereby preserving the effectiveness of section 3. We note further that since section 9(e) of article IV of the Illinois Constitution of 1970 states that once the General Assembly accepts the Governor's specific recommendations for change the bill "shall be presented again to the Governor," it seems reasonable that the reference to section 9(a) of article IV contained in section 3 would include the second presentation to the Governor as well as the first, so that once he "approves the bill," it can then become law.

It is important to note that an alternative construction to section 3 specifically excluding the time when the General Assembly accepts the Governor's specific recommendations for change would produce a result highly prejudicial to the public interest. It is axiomatic that the members of the general public must be given adequate notice of a bill's contents so as to be given a sufficient opportunity to conform their conduct to the law. Under

the facts of the instant case, to hold that the "final legislative action" occurred prior to July 1, 1983, would mandate that House Bill 2244 "passed" at a time when it was not even in its final form due to the subsequent changes in the bill's language made by the Governor. Such a result would be absurd, and would force us to accept the basic premise that a bill can be "passed," thus giving the public notice of its contents, prior to that bill's existing in its final form. To hold that a bill has "passed" at a time when its final content is not yet established would constitute an aberration in the legislative process. Quite clearly, therefore, the legislature's acceptance of the Governor's recommendations for change must be considered an essential element of the final "passage" of an amendatorily vetoed bill.

The consideration of an amendatorily vetoed bill by the General Assembly obviously requires additional legislative action because the original language of the bill is no longer intact. A bill changed upon the Governor's specific recommendation is no longer the same bill as initially "passed" by the General Assembly and the "final legislative action" would not simply be a reaffirmation of the bill's original language as in the situation involving an override of a non-amendatorily vetoed bill. (See *City of Springfield v. Allphin* (1978), 74 Ill. 2d 117.) Thus, in an amendatory veto situation, a bill can only be viewed as "passed" when the legislature has voted to accept the Governor's recommendations for change. Only then is the bill in its final form and can the public be held to have been put on notice as to the bill's actual contents.

In the instant case, the Governor's amendatory veto of House Bill 2244 on September 24, 1983, necessitated additional legislative action by the General Assembly to accept the Governor's specific recommendations for change. This additional legislative action was taken by record vote of the House on October 19, 1983, and by

record vote of the Senate on November 1, 1983, accepting the bill as changed in accordance with the Governor's recommendations. Quite clearly, it was this action which constituted the "final legislative action" taken prior to presentation by the Governor pursuant to section 9(a) of article IV.

Thus, we hold here that a bill that is the subject of an amendatory veto under article IV, section 9(e), of the Illinois Constitution of 1970 is not "passed" for purposes of determining its effective date until the final vote approving the Governor's recommended changes is taken in the General Assembly. Pursuant to section 10 of article IV of the Constitution of 1970 and section 3 of "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1983, ch. 1, par. 1203), Public Act 83—1102 was passed on November 1, 1983, the date the Senate voted to accept the Governor's recommendations for change after the House of Representatives had already done so. Therefore, in accordance with section 10 of article IV of the Constitution and section 2 of "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1983, ch. 1, par. 1202), the effective date of Public Act 83—1102 was July 1, 1984.

In reaching this decision today, we note that our conclusion here is supported by a long line of Attorney General opinions which have held that a bill which is the subject of an amendatory veto under article IV, section 9(e), is not "passed" for purposes of determining its effective date until the final vote approving the Governor's recommended changes is taken in the General Assembly. (See 1975 Ill. Att'y Gen. Op. 77; 1974 Ill. Att'y Gen. Op. 119; 1972 Ill. Att'y Gen. Op. 282; see also 1985 Ill. Att'y Gen. Op. ____, No. 85—004.) A well-reasoned opinion of the Attorney General, although not binding upon this court, is entitled to considerable weight in resolving a question regarding the constitutionality of an Illinois statute. *City of Springfield v. Allphin* (1978), 74 Ill. 2d 117, 130; see

also Scott, *The Role of Attorney General's Opinions in Illinois*, 67 Nw. U.L. Rev. 643, 649-53 (1972).

We further agree with the trial court's determination that because the Port District had fully exercised all the powers granted to it pursuant to the Joliet Regional Port District Act (Ill. Rev. Stat. 1983, ch. 19, par. 254.6) by June 30, 1984, the referendum amendment contained in Public Act 83—1102, which took effect on July 1, 1984, was not applicable to the transaction entered into between the Port District and the Lewis University airport.

As previously explained, the Port District has been empowered since 1957 to *"locate, establish* and *maintain* a public airport *** within its corporate limits *** and to *construct, develop, expand, extend* and *improve* any such airport or airport facility." (Emphasis added.) (See Ill. Rev. Stat. 1983, ch. 19, par. 254.6.) Pursuant to this grant of authority, the Port District in 1980 began looking into the possibility of locating an airport within the District's corporate boundaries. These efforts were completed in late 1983 when the Port District adopted a formal resolution calling for the location, establishment and maintenance of a public airport at the Lewis University airport site, and for the construction, development, expansion, extension and improvement of that airport. The Port District's efforts and its negotiations with Lewis University thereafter resulted in a sale agreement on December 30, 1983, for the acquisition of the Lewis University airport by the Port District. Thus, it is clear here that not only did the Port District have the authority in December 1983 to enter into the sale agreement with Lewis University for the purchase of its airport, but, more importantly, the Port District had in fact exercised all of the powers granted to it pursuant to the Joliet Regional Port District Act (Ill. Rev. Stat. 1983, ch. 19, par. 254.6) prior to the effective date of Public Act

83—1102, which occurred on July 1, 1984. Thus, because the referendum requirement contained in Public Act 83—1102 was not operative prior to July 1, 1984, it had no effect on the transaction entered into between the Port District and Lewis University airport, which was completed by June 30, 1984.

We are also mindful of the fact that on June 14, 1984, the Port District and Lewis University executed an amendment to the sale agreement. The only part of that amendment which is relevant to the issue presented here, however, is a clause which pertains to the securing of authorization for the purchase of the airport by referendum. This clause was intended to condition the purchase of the airport on referendum approval only in the event that the purchase was determined to be subject to Public Act 83—1102. Since the Port District clearly had legislative authority to establish and maintain an airport at the time it entered into the contract and its subsequent amendment (Ill. Rev. Stat. 1983, ch. 19, par. 254.6), we find that the condition was satisfied upon the execution of the sale agreement, and no duty to obtain additional authorization was imposed upon the Port District by the clause.

The plaintiff here further contends that even if the referendum amendment contained in Public Act 83—1102 had no effect on the instant transaction, the referendum amendment may become operative in the future because the Port District intends to expand the Lewis University airport by purchasing additional adjoining lands. We find no merit to this argument. Section 4.6 of the Joliet Regional Port District Act, as amended by Public Act 83—1102 (Ill. Rev. Stat. 1983, ch. 19, par. 254.6), requires the Port District to conduct a referendum only with respect to *establishing and maintaining* the airport. The express language of Public Act 83—1102 provides as follows:

"Such power and those related thereto may be exercised only with the approval of the voters in the district. The Board shall by ordinance, duly adopted, cause to be submitted to the legal voters of the district *a proposition to establish and maintain an airport* within the district by certifying the proposition and the ordinance to the proper election officials who shall submit the proposition to the voters at an election in accordance with the general election law. The proposition shall be in substantially the following form:

| Shall the Joliet Regional Port District be authorized to establish and maintain a public airport facility? | YES | |
| --- | --- | --- |
| | NO | |

If a majority of those voting upon the proposition vote in favor of the proposition, the Board may thereafter exercise such powers." (Emphasis added.)

The plain language of the referendum requirement set forth in Public Act 83—1102 relates only to the establishment and maintenance of the airport. Clearly, the legislature, by the express language used in the amendment, intended only to require a referendum prior to the *initial* exercise by the Port District of the power to establish and maintain the airport. We interpret the language of the referendum to mean that once the Port District has exercised these powers, which in this instance occurred prior to the effective date of the referendum amendment, it would not be required to hold a referendum to further exercise any of the other powers set forth in the enabling act. For example, having established the airport, the Port District does not have to propose a referendum each time it wants to improve or extend the facility. Simply stated, Public Act 83—1102 came too late in this instance because the Port District

had already exercised its authority to establish and maintain an airport pursuant to the powers granted it in accordance with the unamended version of section 4.6 of the Joliet Regional Port District Act.

Furthermore, Public Act 83—1102 cannot be applied retroactively because without an express statutory provision stating that an act is to have retroactive effect, it can only be applied prospectively. (*Village of Wilsonville v. SCA Services, Inc.* (1981), 86 Ill. 2d 1, 18; see also 2 A. Sutherland, Statutory Construction §41.04, at 348 (4th ed. 1986).) Public Act 83—1102 contains no such language, and therefore is to be given prospective effect only.

In view of the fact that Public Act 83—1102 is inapplicable to the instant transaction and can have no future impact on the Port District's operation and control of the airport, we need not decide the defendant's argument presented in its cross-appeal regarding the question of whether Public Act 83—1102 constitutes special legislation in violation of article VI, section 13, of the Illinois Constitution of 1970.

For the foregoing reasons, the judgment of the circuit court is affirmed.

*Judgment affirmed.*

JUSTICE STAMOS took no part in the consideration or decision of this case.