OLGA KASZUBOWSKI *et al.*, Plaintiffs-Appellants, v. THE BOARD OF EDUCATION OF THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—91—3494

Opinion filed June 11, 1993.

452

COUSINS, J., dissenting.

James D. Montgomery and Jean M. Templeton, both of James D. Montgomery & Associates, Ltd., of Chicago, for appellants.

Michael J. Hernandez and Iris E. Sholder, both of Board of Education of City of Chicago, of Chicago, for appellees.

JUSTICE MURRAY delivered the opinion of the court:

The plaintiffs appeal from an order of the trial court dismissing the plaintiffs' claims to recover money damages and injunctive relief against the Interim Board of Education of the City of Chicago (Interim Board or Board)[1] based on contract rights allegedly created by operation of law pursuant to the Illinois School Code. (See Ill. Rev. Stat. 1989, ch. 122, par. 34—1 *et seq.*) Plaintiffs and defendants filed cross-motions for summary judgment. In a memorandum opinion, the trial court granted defendants' motion for summary judgment, holding that no contract rights were created by operation of law.

The facts are as follows.

In approximately 1985 the Board, pursuant to its statutory authority, had divided the Chicago public school district into 23 subdistricts. The Board employed a "superintendent" for each of these 23

---

[1]The tenure of the Interim Board of Education, the named defendants-appellees in this matter, has been completed pursuant to the Illinois School Code. (Ill. Rev. Stat. 1989, ch. 122, par. 34—3(a).) Pursuant to Illinois law, the Board of Education of the City of Chicago, which presently operates the Chicago public schools, has the capacity to sue and be sued. (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.) On March 15, 1991, the trial court granted the present Board of Education of the City of Chicago leave to substitute as defendants in this case. During oral argument in this court, an oral motion was made to amend the caption to reflect the change in parties.

subdistricts.[2] As of July 1989 plaintiffs-appellants Olga Kaszubowski, Aracelis Figueroa, Eleanor Pick, Howard J. Sloan, Frank Venutra, Herbert Schiff, Edith Dervin, Blaine Dene, Carol Wooley, Bernarr E. Dawson, James F. Moore, Norman Silber, and Reginald Brown occupied 13 of those 23 superintendent positions.

After the adoption of the School Reform Act (Act) and prior to the commencement of the school year in September of 1989, the Interim Board announced its intention to "combine" certain "subdistricts." As a result of this "combination," the 23 existing subdistricts were reduced to 11; of the 23 superintendents, 13 had their positions deleted (the plaintiffs in the present case). Three new individuals, who had not previously served as superintendents, were appointed to 3 of the 11 new districts.

On August 22, 1989, plaintiffs filed a complaint challenging the reduction in the number of subdistricts on three grounds. First, the superintendent-plaintiffs alleged that the reduction breached a purported employment contract between themselves and the Board. Second, the superintendent-plaintiffs alleged that the reduction deprived them of their "property" in those positions without due process of law. Finally, the parent-plaintiffs alleged that the reduction violated their rights as parents by reducing the number of elected parent representatives on the school board nominating commission, in alleged violation of the School Reform Act.

Plaintiffs sought injunctive relief to forestall the implementation of this proposal. The trial court granted the defendants' motion to strike plaintiffs' prayers for injunctive relief on August 30, 1989. Count III requested solely injunctive relief and was the only count which related to the parent-plaintiffs (who are not parties to this appeal). As a result, the only matters that remained pending before the trial court were the superintendent-plaintiffs' claims for declaratory relief and damages.

On June 29, 1990, plaintiffs-appellants moved for summary judgment, contending that no material facts were in dispute and that they

[2]The plaintiffs have described their titles as "subdistrict superintendent" throughout this litigation, while the defendants have referred to the plaintiffs as "district superintendents." Defendants' answer asserts that these plaintiffs were never employed as subdistrict superintendents within the meaning of the School Reform Act, Public Act 85–1418, but rather held the position of district superintendent appointed pursuant to section 34–8 (Ill. Rev. Stat. 1961, ch. 122, par. 34–8). Nevertheless, plaintiffs maintain that there is no dispute that the plaintiffs were all employed in an administrative capacity prior to the implementation of the district reduction.

were entitled to a judgment, as a matter of law. Plaintiffs alleged: (1) the School Reform Act established a contract between the superintendent-plaintiffs and defendants; (2) the Interim Board breached that contract by eliminating their former positions; and (3) the Interim Board lacked the authority to eliminate those positions. Plaintiffs asserted that section 34—8.3(g) of the School Reform Act established their purported contract. Section 34—8.3(g) provides:

"All persons serving as subdistrict superintendent on [May 1, 1989], and all persons appointed as subdistrict superintendent after [May 1, 1989,] and prior to July 1, 1991 in a manner other than as provided by Section 34—2.5, shall be deemed by operation of law to be serving under a performance contract which expires on June 30, 1991; and unless such performance contract of any such subdistrict superintendent is renewed (or such person is again appointed to serve as subdistrict superintendent) in the manner provided by Section 34—2.5.[3] the employment of such person as subdistrict superintendent shall terminate on June 30, 1991." (Ill. Rev. Stat. 1989, ch. 122, par. 34—8.3(g) (added by Pub. Act 85—1418, §1, eff. July 1, 1989; amended by Pub. Act 86—124, §1, eff. July 28, 1989; reenacted by Pub. Act 86—1477, §2, eff. Jan. 11, 1991).)

Defendants filed a cross-motion for summary judgment. The motions were briefed and oral argument was heard on October 16, 1990.

Before the trial court could render a written opinion, the Illinois Supreme Court released its opinion in *Fumarolo v. Chicago Board of Education* (1990), 142 Ill. 2d 54, 566 N.E.2d 1283. The *Fumarolo* decision held unconstitutional the School Reform Act on the basis that the election procedure for the local school councils did not meet the strict scrutiny of the one person, one vote rule of law. Although the legislation contained a severability clause, the supreme court held that this constitutional flaw tainted the whole enactment because the local school counsel was the building block upon which school reform was based. Following the action of the supreme court and prior to a decision on the motion for rehearing on February 4, 1991, Public Act 86—1477 was enacted and became effective January 11, 1991. Public Act 86—1477 was enacted to remedy the constitutionally objectionable provision of the School Reform Act by providing for the appointment of all local school council members, subdistrict members, school board

[3]Section 34—2.5 provides for the future selection of subdistrict superintendents or the renewal of contracts of existing subdistrict superintendents by the elected subdistrict council. Ill. Rev. Stat. 1989, ch. 122, par. 34—2.5.

nominating commission members and Board of Education members by the mayor of Chicago. Except for the foregoing change, the legislature readopted verbatim the remaining provisions of the former act, including section 34—8.3(g).

The trial court subsequently required supplemental briefs describing both the impact of the *Fumarolo* decision and subsequent reenactment of the School Reform Act by the legislature (Pub. Act 86—1477, eff. January 11, 1991) to determine if the decision had bearing on the issues before the trial court in the present case. Both sides submitted supplemental memoranda, and argument was heard on the supplemental issues on August 6, 1991.

On September 25, 1991, the trial court issued its memorandum of opinion. The trial court's opinion made the following findings: In May of 1989, plaintiffs acted as superintendents of subdistricts within the City of Chicago school district. The Interim Board reduced the 23 existing subdistricts within the Chicago public school district to 11, and in doing so, eliminated the previously existing subdistricts. Therefore, plaintiffs' positions as subdistrict superintendents were likewise eliminated. Considering the issue of whether section 34—8.3(g) could be construed as creating an enforceable contractual right on behalf of the plaintiffs for the period specified in the statute, the trial court indicated, "The question is whether the legislature intended to give the Interim Board the power to reduce or abolish subdistricts, but yet inhibit its ability to do so by giving vested contractual rights to subdistrict superintendents in office on the effective date of the Act." After citing section 34—21.3, the opinion stated:

> "It would seem unlikely, in light of the above language, that the legislature intended to award performance contracts in Section 34—8.3(g), but yet allowed the Interim School Board to nevertheless abolish existing subdistricts which would have the effect of cancelling the very performance contracts that the legislature gave to subdistrict superintendents.
>
> * * *
>
> If the Court were to interpret Section 34—8.3(g) as creating vested contractual rights on behalf of subdistrict superintendents, the Court would be required to totally disregard the specific language in Section [34—18(7)]. Had the legislature intended Section 34—8.3(g) to provide for vested contractual rights in subdistrict superintendents, it would not have empowered the Interim School Board to immediately reduce the number of subdistricts under Section [34—18(7)].

The Court finds that a more logical interpretation of Section 34—8.3(g) is that that Section is merely a statement of policy to be pursued subject to the Interim Board's powers under Section 34—21.3(a) to implement an annual school budget."

The trial court held that the mere reference to "performance contract" does not suggest a legislative intent to create vested contractual rights. Finding its analysis compatible with the legislative intent of the statute, the trial court's opinion noted that Representative Levin, a sponsor of the Act, left no doubt as to the intent behind section 34—8.3(g). During the House of Representatives' debates on the 1989 amendment to the School Reform Act, Representative Levin stated:

"[T]hat Section 34—8.3(g), the provision we put in last year that provides that performance contracts established by operation of law *** that provision, was not intended to preclude the interim board from reorganizing the number of districts superintendent positions or does it require the interim board, having reorganized the number of districts, to pay the previous occupants of the districts superintendent positions the salaries that they would have gotten if they would have continued in their positions." 86th Ill. Gen. Assem., House Proceedings, June 30, 1989, at 170.

Judgment was entered in favor of defendants on September 30, 1991. This timely appeal was filed.

The plaintiffs raise two issues on appeal: (1) Whether the provisions of section 34—8.3(g) (Ill. Rev. Stat. 1991, ch. 122, par. 34—8.3(g)) created a performance contract by operation of law under which plaintiffs could claim damages, and (2) whether the trial court properly entered summary judgment in favor of defendants and denied summary judgment to the plaintiffs.

For the following reasons, we reverse the decision of the trial court.

As the facts are undisputed in the present case, and the decision rests on the proper interpretation of the statute, we review the trial court's ruling as a matter of law. *Village of Spring Grove v. Doss* (1990), 202 Ill. App. 3d 858, 563 N.E.2d 793; see also *People v. 1946 Buick, VIN 34423520* (1989), 127 Ill. 2d 374, 378, 537 N.E.2d 748.

One of the basic rules of statutory construction is that where the intent of a statute can be ascertained from the statutory language itself, it must be given effect without resort to extrinsic aids for construction. (*Whiteco Metrocom Division v. Village of Downers Grove* (1990), 197 Ill. App. 3d 174, 181, 553 N.E.2d 1145; see also *People v.*

*Wittenmyer* (1992), 151 Ill. 2d 175, 195, 601 N.E.2d 735.) A primary rule of statutory construction is that a court is required to ascertain and give effect to the intent of the legislature. (*Fumarolo v. Chicago Board of Education* (1990), 142 Ill. 2d 54, 96, 566 N.E.2d 1283.) Courts should first look to the statutory language, as the best indication of the intent of the drafters (*County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 151, 485 N.E.2d 1076), and such intent is best determined by the plain and ordinary meaning of the statutory language. *People v. Pettit* (1984), 101 Ill. 2d 309, 313, 461 N.E.2d 991; see also *People v. Wittenmyer* (1992), 151 Ill. 2d 175, 195, 601 N.E.2d 735.

We must assume that the legislature intended to enact a statute that was consistent with the constitution, giving effect to as much of a statute as is possible, consistent with the constitution, and construing the Act in light of the subject it addresses and its apparent objective. *Dornfeld v. Julian* (1984), 104 Ill. 2d 261, 266, 472 N.E.2d 431.

As the court in *Morrison v. Chicago Board of Education* (1989), 188 Ill. App. 3d 588, 594, 544 N.E.2d 1099, stated:

"Statutes must be construed so as to ascertain and give effect to the intention of the legislature as expressed in the statute, and absent some clear legislative intent to the contrary, terms are to be given their ordinary and commonly understood meaning. The language used in a statute is the primary source for determining legislative intent, and where that language is certain and unambiguous, the proper function of the courts is to enforce the statute as enacted. [Citation.] *** [A]nd the court must choose a construction which gives the statute a clear, logical meaning, rather than a meaning that renders the statute illogical, useless or unreasonable."

Where the language of a statute admits of two constructions, one of which would render the enactment absurd and illogical, while the other would render it reasonable and sensible, the former construction must be avoided. (*Mulligan v. Joliet Regional Port District* (1988), 123 Ill. 2d 303, 312-13, 527 N.E.2d 1264.) Statutes must be construed in the most beneficial way which their language will permit, so as to prevent hardship or injustice, and to oppose prejudice to public interests. (See *Illinois National Bank v. Chegin* (1966), 35 Ill. 2d 375, 220 N.E.2d 226.) The court must look at the statute as a whole, taking into consideration its nature, its purposes and the evil the statute was intended to remedy; each word, clause, or sentence of a statute must not be rendered superfluous but must if possible, be given some rea-

sonable meaning. *Whiteco Metrocom Division v. Village of Downers Grove* (1990), 197 Ill. App. 3d 174, 181, 553 N.E.2d 1145.

The plaintiffs contend that the plain language of the statute creates a contractual right where none had previously existed. (See Ill. Rev. Stat. 1991, ch. 122, par. 34—8.3(g).) Moreover, the plaintiffs maintain the legislative history of the act also supports the conclusion that the statute was intended to create a contract. Contrary to the plaintiffs' contentions, defendants argue that neither the plain language of the statute nor the legislative history of the Illinois School Code supports the conclusion that the statute was intended to afford the plaintiffs contract rights as a matter of law. Consequently, defendants maintain that the trial court properly granted their motion for summary judgment.

Defendants maintain section 34—8.3(g) must be considered in the overall context of the School Reform Act, and argue that when the School Reform Act is read as a whole, it clearly authorized the Interim Board to order the administrative reorganization that plaintiffs claim breached their "contract." Defendants argue a provision of the School Code left unaltered by the School Reform Act expressly confers on the Board of Education of the City of Chicago the power to "divide the city into subdistricts." (Ill. Rev. Stat. 1991, ch. 122, par. 34—18(7).) In addition defendants note, "subdistrict," as acknowledged in the plaintiffs' complaint and defined in the School Reform Act, means:

> "[A] geographic area of the school district formed by boundaries which are coterminous with the boundaries of any one of the elementary or high school administrative subdistricts into which the city is divided, as those elementary or high school administrative subdistrict boundaries existed on January 1, 1988, *or as those subdistrict boundaries hereafter are changed by the board as provided in paragraph 7 of Section 34—18.*" (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 122, par. 34—1.1.)

Section 34—18(7) gives the Board the power "[t]o divide the city into subdistricts." Ill. Rev. Stat. 1989, ch. 122, par. 34—18(7).

A reading of the entire reenacted School Reform Act does not indicate any intent to throw plaintiffs to the wolves when their subdistricts were eliminated. Actually, taken as a whole, the express language of section 34—8.3(g) indicates an intention to give the subdistrict superintendents a golden parachute, much like private corporations give executives.

We find the words in the statute are not ambiguous. The class of persons serving as subdistrict superintendents on May 1, 1989, can be

readily ascertained. The plaintiffs were clearly members of that class. Black's Law Dictionary defines "deem" as "[t]o hold; consider; adjudge; believe; condemn; determine; treat as if; construe." (Black's Law Dictionary 374 (5th ed. 1979).) The definition of "operation of law" states: "This term expresses the manner in which rights, and sometimes liabilities, devolve upon a person by the mere application to the particular transaction of the established rules of law, without the act or co-operation of the party himself." (Black's Law Dictionary 985 (5th ed. 1979).) Therefore, section 34—8.3(g) indicates that by the mere application of the School Reform Act, the persons employed as subdistrict superintendents on May 1, 1989, would be adjudged to be serving under a performance contract which expires on June 30, 1991.

In terms of what the performance contract would entail, the School Reform Act sets forth various duties of the subdistrict superintendents. (See Ill. Rev. Stat. 1991, ch. 122, par. 34—1 *et seq.*) Section 34—2.1(k) provides that the subdistrict superintendent shall resolve any disputes concerning election procedure of the local school councils or the results. (Ill. Rev. Stat. 1991, ch. 122, par. 34—2.1(k).) Section 34—2.5(a) gives the subdistrict superintendents the power to declare a vacancy on a subdistrict council if a subdistrict council fails to maintain qualifications as a member of the local school council. (Ill. Rev. Stat. 1991, ch. 122, par. 34—2.5(a).) Section 34—8.3 provides in relevant part:

"Subdistrict superintendents. (a) Each subdistrict superintendent shall monitor the performance of the attendance centers within the subdistrict boundaries and shall identify the attendance centers that have:

(1) failed to develop or implement a school improvement plan;

(2) failed to make adequate progress toward complying with a school improvement plan;

(3) failed or refused to comply with its school improvement plan; or

(4) otherwise failed or refused to comply with the provisions of this Act ***.

(b) If the subdistrict superintendent identifies a nonperforming school as described herein, he shall (1) notify the subdistrict council and (2) obtain the council's approval to place the attendance center on remediation by developing a remediation plan for the center. The purpose of the remediation plan shall be to correct the deficiencies in the performance of the attendance center by one or more of the following methods:

(1) drafting a new school improvement plan;

(2) applying to the board for additional funding for training for the local school council;

(3) directing implementation of a school improvement plan;

(4) mediating disputes or other obstacles to reform or improvement at the attendance center.

If, however, the subdistrict superintendent determines that the problems are serious or not able to be remediated by these methods, or where a remediation plan has been developed by the subdistrict superintendent and the superintendent determines that remediation has not been successful, the subdistrict superintendent shall notify the subdistrict council and shall obtain the council's approval to place the attendance center on probation.

\* \* \*

(h) Each subdistrict superintendent shall, in consultation with local school councils, conduct an annual evaluation of each principal under his or her jurisdiction pursuant to guidelines promulgated by the Board of Education." (Ill. Rev. Stat. 1991, ch. 122, par. 34—8.3.)

In addition, the subdistrict council is to evaluate the performance of the subdistrict superintendent and to establish additional criteria to be included as part of the performance contracts of its subdistrict superintendent. Ill. Rev. Stat. 1991, ch. 122, pars. 34—2.5(e)(1), (e)(3).

In its memorandum opinion, the trial court indicated that if the legislature intended section 34—8.3(g) to provide for vested contractual rights in subdistrict superintendents, it would not have empowered the Interim School Board to immediately reduce the number of subdistricts. The trial court found "that a more logical interpretation of Section 34—8.3(g) is that that Section is merely a statement of policy to be pursued subject to the Interim Board's powers under Section 34—21.3(a) to implement an annual school budget."

Section 34—21.3(a) provides:

"Limitation on powers of board and Interim Board. Notwithstanding any other provision of this Act or Article, during and throughout the 1989-1990 fiscal year of the board or Interim Board, the board or Interim Board shall limit its activities and the exercise of its powers (other than its taxing and bonding powers and its responsibilities with respect to the adoption of the annual school budget for the 1989-1990 fiscal year of the board or Interim Board) to dealing with issues which will not impede or be detrimental to, and shall address those issues

which will assist in, the implementation of the provisions of this amendatory Act of 1988; and during and throughout the 1989-1990 fiscal year of the board or Interim Board, neither the board nor Interim Board nor the general superintendent of schools shall enter into, renew, extend or renegotiate any contracts with any 'exclusive representative' *** or other collective bargaining representatives of any school district employees, nor enter into any new or other contracts or agreements which would conflict with any of the provisions of this amendatory Act of 1988." (Ill. Rev. Stat. 1989, ch. 122, par. 34—21.3a.)

The only policy this court can discern from the language of section 34—8.3(g) is an intention to employ the subdistrict superintendents until June 30, 1991.

The court must look at the statute as a whole, taking into consideration its nature, its purposes and the evil the statute was intended to remedy; each word, clause, or sentence of a statute must not be rendered superfluous but must, if possible, be given some reasonable meaning. (*Whiteco Metrocom Division v. Village of Downers Grove* (1990), 197 Ill. App. 3d 174, 181, 553 N.E.2d 1145.) It is the position of the plaintiffs that since the language of section 34—8.3(g) clearly and unambiguously granted them a contract by operation of law, the subsequent actions of the Interim Board which resulted in their termination or reassignment violated those contractual rights. We agree. Following the rules of statutory construction and utilizing the plain meaning of section 34—8.3(g), we believe the legislature intended to create a contract with the subdistrict superintendents effective until June 30, 1991.

Defendants cite to *Fitzsimmons v. O'Neill* (1905), 214 Ill. 494, and *Woolfolk v. Board of Fire & Police Commissioners* (1979), 79 Ill. App. 3d 27, 31, 398 N.E.2d 226 in support of the proposition that governmental units have inherent authority to economize through reorganization, even at the expense of employees protected against discharge except "for cause." However, we find those cases distinguishable from the present case where we find that the language of the statute specifically created a contract right.

Defendants also argue, assuming, *arguendo*, that the School Reform Act established a contract between the superintendent-plaintiffs and the Interim Board, that that contract necessarily includes the Interim Board's authority to reduce the number of subdistricts and, hence, the number of district superintendents. Defendants cite to the comments made by Representative Levin and argue that since the

plaintiffs specifically relied on the 1989 amendment as creating part of their "contract" and treat it as a piece with the original enactment, this legislative history of the amendment is highly relevant.

Representative Levin's comments were made in support of the adoption of the conference committee report. This was after the *Fumarolo* decision and prior to the reenactment of section 34—8.3(g). Prior to his comments regarding the subdistrict superintendents, he acknowledged that the legislation was a compromise and that there were some provisions that were very good as well as some provisions that he would probably rather not have. We find no other comments regarding the subdistrict superintendents. We do not believe that Representative Levin's isolated comments standing alone indicate the intent of the entire legislature. Nevertheless, since the intent of the legislature is best determined by the plain and ordinary meaning of the statutory language, and we have found that the plain meaning indicates an intent to give the subdistrict superintendents a contract until June 30, 1991, we need not consider the comments of Representative Levin.

We find that the defendants had the power to change the subdistricts; however, regardless of any decision regarding such subdistricts, the plaintiffs had contracts that did not expire until June 30, 1991. By the plain meaning of the statute, the subdistrict superintendents had contracts that expired on June 30, 1991. As far as the court can see, the Board had several options: (1) wait to implement the redistricting until June 30, 1991; (2) redistrict while retaining all the subdistrict superintendents until June 30, 1991; or (3) redistrict, eliminate the excess superintendents, but yet remain liable to compensate the superintendents for their damages in contract through June 30, 1991. Thus, we believe that section 34—8.3(g) is not rendered superfluous by conceding that the defendants had the power to reduce the number of subdistricts.

Although the intent of this legislation clearly was the improvement of the school system, the legislation has not wanted for lack of controversy. In looking at the legislative history of the Illinois School Code and the School Reform Act, we find it unfortunate that Representative Turner's statements prior to the first enactment of this legislation appear to have come true. He stated:

"I think the people who are going to benefit most are the lawyers, are those who are involved with the contracts, *** because this Bill certainly is unconstitutional and yes, it has a lot of flaws. But the constitutionality is going to be tested before

we can correct the flaws on this particular Bill." (85th Ill. Gen. Assem., House Proceedings, December 1, 1988, at 82.) Representative Turner further stated that significant legal bills would be incurred in "trying to determine what is said and what is what in this particular Bill." 85th Ill. Gen. Assem., House Proceedings, December 1, 1988, at 83.

Accordingly, for all the reasons set forth above, we reverse the trial court's grant of summary judgment in favor of the Interim Board and remand with directions to grant the plaintiffs' motion for summary judgment on the issue of the existence of a contract expiring on June 30, 1991, as expressly provided in the aforecited legislation and to conduct further proceedings as to the plaintiffs' damages, if any, in contract.

Reversed and remanded with directions.

GORDON, P.J., concurs.

JUSTICE COUSINS, dissenting:

Deciding that the enactment by the legislature of the School Reform Act (Act) created a contract by operation of law patently misinterprets the legislative intent. The majority opinion is based solely upon the portion of the Act which provides in part as follows:

"All persons serving as subdistrict superintendent on May 1, 1989, and all persons appointed as subdistrict superintendent after May 1, 1989 and prior to July 1, 1991 in a manner other than as provided by Section 34—2.5[4] shall be *deemed by operation of law to be serving under a performance contract* which expires on June 30, 1991; and unless such performance contract of any such subdistrict superintendent is renewed (or such person is again appointed to serve as subdistrict superintendent) in the manner provided by Section 34—2.5 the employment of such person as subdistrict superintendent shall terminate on June 30, 1991." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 122, par. 34—8.3(g).

The majority opinion upholds the contention of the plaintiffs-appellants, who were subdistrict superintendents, that the Interim School Board (Interim Board or Board) violated section 34—8.3(g) of

---

[4]Section 34—2.5 provides for the future selection of subdistrict superintendents or the renewal of contracts of existing subdistrict superintendents by the *elected* subdistrict council.

the Act and breached their contractual rights by eliminating the positions of 13 subdistrict superintendents.

Ignored in the opinion are other pertinent provisions and the procedural history of the Act. The opinion also expressly disregards comments made by Representative Ellis Levin, one of the primary sponsors of the school reform legislation, regarding the precise issue under consideration in this appeal. Contrary to a view expressed by my esteemed colleagues, the Act should not be interpreted to indicate any intent "to give the subdistrict superintendents a golden parachute, much like private corporations give executives." See 248 Ill. App. 3d at 458.

In interpreting legislation, a statute must be construed so as to ascertain and give effect to the intention of the legislature as expressed in the statute, and absent some clear legislative intent to the contrary, terms are to be given their ordinary and commonly understood meaning. (*Morrison v. Chicago Board of Education* (1989), 188 Ill. App. 3d 588, 594.) A preamble can be taken into account when ascertaining the goals of a legislative body. (*Geri's West, Inc. v. Ferrall* (1987), 153 Ill. App. 3d 579, 583.) Legislative intent is to be determined not only from the language used, but also from the reasons for the enactment of the statute and the objectives to be achieved thereby. (*Penkava v. Kasbohm* (1987), 117 Ill. 2d 149, 154.) Where the language of the statute admits of two constructions, one of which would render the enactment absurd and illogical, while another would render it reasonable and sensible, the former construction must be avoided. *Mulligan v. Joliet Regional Port District* (1988), 123 Ill. 2d 303, 312-13.

The purpose of the Act is set forth in Public Act 86—1477, which reads:

"AN ACT concerning school reform, amending named Acts.

Be it enacted by the People of the State of Illinois, represented in the General Assembly:

Section 1. The purpose of this amendatory Act of 1991 is to ratify and confirm the actions of the Board of Education of the City of Chicago *** in light of the decision of the Illinois Supreme Court in *Fumarolo v. Chicago Board of Education*, Docket No. 69558, opinion filed November 30, 1990, holding Public Act 85—1418 to be unconstitutional, pending further judicial action in that litigation and pending further action by the General Assembly amending Public Act 85—1418." Pub. Act 86—1477, eff. January 11, 1991.

The Act creates new decision-making bodies having limited powers (local school councils, subdistrict councils, and a school board nominating commission) but expressly provides that *"[t]he board shall exercise general supervision and jurisdiction over the public education and the public school system of the city \*\*\*."* (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 122, par. 34—18.) *In the exercise of this general supervisory authority, the Board remains specifically empowered "[t]o divide the city into subdistricts."* (Emphasis added.) Ill. Rev. Stat. 1991, ch. 122, par. 34—18(7).

Defendants-appellees Interim Board took office in May 1989. The Interim Board was mandated by the Act to make educational improvements generally, and specifically to

> "maximize the proportion of school district resources in direct support of educational, program, and building maintenance and safety services for the pupils of the district, and which correspondingly *minimize* the amount and *proportion of* such *resources associated with centralized administration,* administrative support services, and other noninstructional services." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 122, par. 34—43.1(A).)

In fact, the General Assembly directed the Interim Board to "undertake budgetary and expenditure control actions" for the 1989-90 school year which would carry out this mandate. Ill. Rev. Stat. 1991, ch. 122, par. 34—43.1(A).

Pursuant to this legislative directive, the Interim Board established a budget task force, made up of both outside educational experts and Board employees, to shape a 1989-90 budget that would maximize the proportion of expenditures going for direct educational services and minimize the proportion of expenditures going to centralized administration. The budget task force recommended budget reductions for administrative personnel of approximately $40 million dollars—or the elimination of approximately 500 positions. In particular, after analyzing the functions of subdistrict offices and the needs of the local school outlined in the Act, the budget task force recommended a reduction in the number of administrative subdistricts from 23 to no more than 11, or, alternatively, to as low as 6.

On August 11, 1989, the Interim Board adopted the budget task force's recommendations and announced a reorganization plan featuring the elimination of 22 top-level administrative positions. Several departments were consolidated. Three field assistant superintendent positions were eliminated. Finally, the system of 23 subdistricts, each with its own district superintendent, was abolished. The Interim

Board replaced that system with a far more streamlined system of 11 entirely new subdistricts, each with a "subdistrict superintendent," a position with significantly different duties than had been vested in the old "district superintendent" position.

The majority opinion upholds the contention of the plaintiffs-appellants that there is a statutorily created contract between them and the Interim Board, and that this purported contract precluded the elimination of their former offices. The sole basis for this contention is a single sentence in the School Reform Act: "All persons serving as subdistrict superintendent on [the effective date of this amendatory act of 1988] May 1, 1989 *** shall be deemed by operation of law to be serving under a performance contract which expires on June 30, 1991 ***." (Ill. Rev. Stat. 1991, ch. 122, par. 34—8.3(g).) The particular provision on which plaintiffs-appellants rely must be considered in its overall context and each word, clause or sentence should be given some reasonable meaning. When the Act is read as a whole, it clearly authorized the Interim Board to order the administrative reorganization that the superintendent plaintiffs-appellants claim breached their "contract."

It is noteworthy that a provision of the School Code left unaltered by the Act expressly confers on the Board the power to "divide the city into subdistricts." (Ill. Rev. Stat. 1991, ch. 122, par. 34—18(7).) Thus, as argued by defendants-appellees, the contention that the Interim Board was "without authority" to undertake its reorganization is belied by the very statute from which the superintendent plaintiffs-appellants' alleged contractual right is derived.

Another pertinent provision in the Act defines a subdistrict as follows:

> " 'Subdistrict' means a geographic area of the school district formed by boundaries which are conterminous with the boundaries of any one of the elementary or high school administrative subdistricts into which the city is divided, as those elementary or high school administrative subdistrict boundaries existed on January 1, 1988, *or as those subdistrict boundaries hereafter are changed by the board* as provided in paragraph 7 of Section 34—18." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 122, par. 34—1.1.

Plaintiffs-appellants contend that the Interim Board lacked the authority to reorganize the subdistricts. However, this contention is refuted by the express language of the (amended) School Code. The contention is also refuted by the case law.

It is well settled that the Board of Education of the City of Chicago is not even limited to the powers expressly conferred upon it by statute. To the contrary, "[t]he Board of Education of the City of Chicago is a body politic and corporate created to perform governmental functions in connection with the education of children in the school district that consists of Chicago, and it has such powers as are expressly conferred, or *such as may be necessary to carry into effect* those granted by the legislature." (Emphasis added.) *Board of Education v. Chicago Teachers Union, Local 1* (1975), 26 Ill. App. 3d 806, 810.

It is a fundamental principle of government that one of the necessary powers of a governmental entity is the power to achieve economies through reorganization or elimination of unnecessary positions. The seminal Illinois case on this proposition is *Fitzsimmons v. O'Neill* (1905), 214 Ill. 494. Fitzsimmons was an employee of the City of Chicago covered by a State civil service law that provided that he could not be "removed or discharged except for cause" (*Fitzsimmons*, 214 Ill. at 503). Fitzsimmons was discharged when his position was eliminated and his duties redistributed because "the city and its officers *** were of the opinion, entertained by them in good faith, that the position was unnecessary and involved a useless expense." (*Fitzsimmons*, 214 Ill. at 499-500.) The Illinois Supreme Court soundly rejected Fitzsimmons' contention that his dismissal violated the civil service act. The court held that the civil service act did "not apply to a case where the incumbent is dismissed for want of funds, or in order to reduce expenses." (*Fitzsimmons*, 214 Ill. at 503.) More fundamentally, the court emphasized that "[i]t certainly would be a harsh doctrine to hold that a city, or its officials, could not reduce their expenses by abolishing an unnecessary office, or refusing to make an appropriation for the salary of an office, when it was short of funds and did not need the services of the incumbent of such office." (*Fitzsimmons*, 214 Ill. at 505.) This rule that governmental units have inherent authority to economize through reorganization even at the expense of employees protected against discharge except "for cause" continues to be the law in this State. See, *e.g., Woolfolk v. Board of Fire & Police Commissioners* (1979), 79 Ill. App. 3d 27, 31 (no violation of "for cause" requirement where police officers were discharged because their jobs were abolished).

Assuming, *arguendo*, that the Act established a contract between the superintendent plaintiffs-appellants and the Interim Board, the contract necessarily includes the Interim Board's authority expressly conferred in the very same statute to reduce the number of subdis-

tricts (and, hence, the number of district superintendents). It is well settled that "the law existing at the time and place of the making of the contract is deemed a part of the contract, as though expressly referred to or incorporated in it." (*Schiro v. W.E. Gould & Co.* (1960), 18 Ill. 2d 538, 544; *Local 165 v. Bradley* (1986), 149 Ill. App. 3d 193, 211.) Thus, for example, in *S & D Service, Inc. v. 915-925 W. Schubert Condominium Association* (1985), 132 Ill. App. 3d 1019, 1023, the plaintiff was held to have no right to possession of certain property under a lease because the statutory provision invoked by the defendants-appellees as the basis for terminating the lease was, as a matter of law, an implied term of the lease contract. Similarly, here, any contract between the superintendent plaintiffs-appellants and the Interim Board necessarily included as one of its terms the Interim Board's statutory authority to eliminate their positions altogether.[5]

Another pertinent provision to consider is section 5 of Public Act 86—1477. This section ratified and confirmed all the acts of the Interim Board, such as the reduction in the number of subdistricts and the appointment of persons as subdistrict superintendent. Section 5 reads in relevant part:

> "Section 5. All actions taken and proceedings conducted in accordance with The School Code, notwithstanding that such actions or proceedings were taken pursuant to Public Act 85—1418, during the period beginning on May 1, 1989, and ending on the effective date of this amendatory Act of 1991 in a school district organized under Article 34 of The School Code by the school district's interim board of education, board of education *** are hereby ratified and confirmed." Pub. Act 86—1477, eff. January 11, 1991.

Thus, all past reorganization was ratified and confirmed. Therefore, the reduction in subdistricts from 23 to 11 was ratified and confirmed. No doubt should now exist as to the validity of the action.

The *Fumarolo* decision clearly shows that the Board's motion for summary judgment should have been granted. (See *Fumarolo v. Chicago Board of Education* (1990), 142 Ill. 2d 54.) The decision in *Fu-*

---

[5]The general rule that a relevant statutory provision is an implied term of any contract applies with even greater force here, because the provision being invoked is a part of the very same statute, the amended School Code, alleged to have established the contract. It is a fundamental principle of statutory construction, of course, that, "[a] statute should be evaluated as a whole; each provision should be construed in connection with every other section." *Miller v. Department of Registration & Education* (1979), 75 Ill. 2d 76, 81.

*marolo* addressed the subject of whether or not legislation creates and vests private contractual rights between individuals and the Board. Originally, section 34—84 of the School Code of Illinois, deleted in the Act, stated that Chicago school principals became permanent in their positions following three years of satisfactory service after appointment. The plaintiff Chicago school principals alleged in *Fumarolo* that this statutory tenure provision was contractual and vested them with contractual rights. The supreme court of Illinois in *Fumarolo* rejected the allegation that the State statute vested contractual rights in the principals and wrote:

> "As the Supreme Court in *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.* (1985), 470 U.S. 451, 466, 84 L. Ed. 2d 432, 446, 105 S. Ct. 1441, 1451, stated, '[T]he presumption is that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." ' " *Fumarolo*, 142 Ill. 2d at 104.

A reading of section 34—8.3(g) (Ill. Rev. Stat. 1991, ch. 122, par. 34—8.3(g)) clearly shows that the State legislature did not intend to create private contractual rights between the subdistrict superintendents and the Board. A policy was established that subdistrict superintendents would be employed as if on a performance contract until June 30, 1991. The language of the statute states that the subdistrict superintendents shall be "deemed by operation of law to be serving under a performance contract." Webster's II, New Riverside University Dictionary 355 (1984) defines "deem" as "to consider or judge." The plain meaning of the statutory language clearly shows that the statute did not establish contracts between the subdistrict superintendents and the Board. The arrangement between the parties was to be considered or judged to be a performance contract until the subdistrict superintendent was selected by the subdistrict council as prescribed by another section of the statute. Section 34—8.3 of the Act did not state that an employment contract between the Board and individual subdistrict superintendents was established. This interpretation of section 34—8.3(g) is consistent with the reasoning of *Fumarolo*.

Plaintiff's attorney, James D. Montgomery, in proceedings at a hearing on motions pending before the trial court on October 16, 1990, recognized the importance of the statement of Representative Ellis Levin. The record of proceedings contains the following excerpts from Montgomery's argument:

"MR. MONTGOMERY: The following legislative Section: 'And unless such performance contract is renewed, the employment of such person shall terminate on June 30, 1991.'

So that initially the legislature made it expire in 1990. In the following section, some amendatory provisions, they among other things extended that contract for one year.

The Defendants claim that that language does not create a contract. They claim basically that it doesn't create a contract largely because Ellis Levin, one of the legislatures [sic], in a comment at the time that the second year was added to the contract, made it clear that it was his position that this was not a contract and that the members of—the persons who held those positions did not get in it rights by virtue of that provision. Clearly that was his intent, and that was clearly his position."

The trial judge considered his argument that the plain language of the statute clearly indicates a legislative intent to confer contractual rights on the basis of performance for a period of two years. The judge considered the language of the statute and found that both the statute in its entirety and the statements of Representative Levin indicated that no contract was created.

At the October 16, 1990, hearing, other pertinent argument which the trial judge heard included the following:

"MR. BAUM: ***

So the Board authority to terminate—to reduce the number of sub-districts was itself a term of any contract. It cannot be a breach of a contract to exercise authority conferred by that contract.

THE COURT: If that was the legislative intent, what was the reason why the specific language in regard to performance contracts was inserted in 8.3?

MR. BAUM: The purpose of the performance contracts, we do not have legislative history to describe it, but the purpose of the performance contracts is to prevent those individuals that the legislature designated from being terminated from their positions without cause as in a civil service arrangement; but that is not inconsistent with the ability to eliminate positions as parts of an administrative reorganization, and that's clear from Illinois case law going back to 1905."

In granting the defendants-appellees motion for summary judgment, the trial judge considered the pleadings, briefs, statutes, case

law and arguments, and wrote a memorandum of opinion. Following are excerpts from the opinion:

"The Court finds that a more logical interpretation of Section 34—8.3 (g) is that Section is merely a statement of policy to be pursued subject to the Interim Board's powers under Section 34—21.3 (a) to implement an annual school budget.

\* \* \*

The mere reference to 'performance contract' in the Act does not suggest a legislative intent to create vested contractual rights. '[T]he presumption is that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." ' (*National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.* (1985), 470 U.S. 451, 466, 84 L. Ed. 2d 432, 446, 105 S. Ct. 1441, 1451.) Thus, a party who asserts that a law creates contractual rights has the burden of overcoming the presumption that a contract does not arise out of a legislative enactment. (*Fumarolo*, 142 Ill. 2d at 104.) In determining whether a statute was intended to create a contractual relationship between the State and the affected party, courts must examine the language of the statute. (*Dodge v. Board of Education* (1937), 302 U.S. 74, 78, 82 L. Ed. 57, 61, 58 S. Ct. 98, 100.) In *Fumarolo*, the Illinois Supreme Court reviewed what factors should be considered in distinguishing between legislative enactments merely creating statutory rights versus enactments creating contractual rights. Referring to *Indiana ex rel. Anderson v. Brand* (1938), 303 U.S. 95, 82 L. Ed. 685, 58 S. Ct. 443, our supreme court observed that:

'[i]n *Brand* the Court found that a statute providing for teacher tenure created a contract between the State and the plaintiffs, teachers, because there was clear evidence of the legislative intent to contract. Indicative of such legislative intent was the fact that the word "contract" was used *throughout the statute* to describe the legal relationship between teachers and the State, that the act was a supplement to a preexisting statute requiring that teachers' employment contracts be in writing and that the Indiana court had held that teachers' rights to continued employment pursuant to the teacher tenure act were contractual.' *Fumarolo*, 142 Ill. 2d at 105.

Section 34—8.3 (g) sets forth eight paragraphs and twelve subparagraphs which list the duties of subdistrict superintend-

ents. The Court does not garner a legislative intent to award vested contractual rights from the fact that *one* of those paragraphs refers to a policy of awarding performance contracts. The instant Act is considerably different than the facts found in *Indiana ex rel. Anderson v. Brand* (1983), 303 U.S. 95, 82 L. Ed. 685, 58 S.Ct. 443, wherein the word 'contract' appeared ten times; the title of the Act was couched in terms of contract; and there was a detailed definition of the contractual relationship between the parties.

Finally, the above analysis is compatible with the legislative intent of the statute as set forth in the legislative debates. In determining legislative intent, 'Courts may examine the history of legislation and the course it has taken.' (*People v. Easley* (1988), 119 Ill. 2d 535, 540.) Also, '[w]here the statutory language does not adequately convey the legislative intent, the courts may look to the legislative history', including House and Senate debates. (*C.S. Johnson Co. v. Champaign National Bank* (1984), 126 Ill. App. 3d 508, 510.) During the House of Representative's debates on the 1989 Amendment to the School Reform Act, Representative Levin, a sponsor of the Act, left no doubt as to the intent behind section 34—8.3 (g) which had been enacted one year earlier. Representative Levin stated:

'That Section 34—8.3 (g) the provision we put in last year that provides that performance contracts established by operation of law ... that provision was not intended to preclude the interim board from reorganizing the number of Districts Superintendent positions or does it require the Interim Board having reorganized the number of districts to pay the previous occupants of the District Superintendent position the salaries that they would have gotten if they should have continued in their positions.' "

The judgment of the trial court granting defendants-appellees' motion for summary judgment should be affirmed.