# Illinois Official Reports

## Appellate Court

---

**Ohle v. The Neiman Marcus Group, 2016 IL App (1st) 141994**

---

| | |
|---|---|
| Appellate Court Caption | CATHERINE OHLE, Plaintiff-Appellant, v. THE NEIMAN MARCUS GROUP, Defendant-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-14-1994 |
| Filed | September 27, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-11260; the Hon. Kathleen Kennedy, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Stephan Zouras, LLP, of Chicago (Ryan F. Stephan, of counsel), for appellant.<br><br>Jackson Lewis P.C., of Chicago (Neil H. Dishman and R. Breanne Dunn, of counsel), for appellee. |
| Panel | JUSTICE PIERCE delivered the judgment of the court, with opinion.<br>Presiding Justice Hyman and Justice Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1     Plaintiff, Catherine Ohle, was denied a job because of a failed credit check that she claims is a violation of the Employee Credit Privacy Act (Act) (820 ILCS 70/1 *et seq.* (West 2012)). The employer, defendant The Neiman Marcus Group, claimed an exemption because the position gave the employee "access" to personal and confidential customer information. Summary judgment was granted in favor of defendant. The trial court found the position fell within the "access" provision of the Act. For the following reasons, we reverse the judgment of the trial court.

¶ 2     Plaintiff applied for a job at Neiman Marcus's Oak Brook, Illinois, store as an entry-level "Dress Collections Sales Associate." Ohle was interviewed and was informed that she should expect an offer for the position, pending completion of a successful background check. Neiman Marcus ran a background check through a third-party vendor. The third party informed Neiman Marcus that Ohle failed her credit check and, on that basis, did not investigate the remaining areas of inquiry. The report indicated Ohle had several civil judgments against her and several accounts in collections. On July 17, 2012, Ohle received a letter from the reporting agency informing her that she failed the credit check, and based on her credit report, she would not be hired.

¶ 3     Plaintiff filed this suit individually and on behalf of a class,[1] alleging a claim for violation of the Act (820 ILCS 70/1 *et seq.* (West 2012)). The Act prohibits an employer from inquiring into a potential employee's credit history and prohibits an employer from refusing to hire the applicant or discriminating against the applicant because of his or her credit history. 820 ILCS 70/10(a) (West 2012). The Act also provides an exemption where a "satisfactory credit history" is an "established bona fide occupational requirement of a particular position." 820 ILCS 70/10(b) (West 2012). For a *bona fide* occupational requirement to exist, at least one of seven circumstances identified in the Act must be present.[2] *Id.* An individual who is injured by a violation of the Act is permitted to bring a civil action to obtain injunctive relief, damages, or both, and if the injured party prevails, she may be awarded costs and reasonable attorney fees. 820 ILCS 70/25 (West 2012).

¶ 4     Ohle alleged Neiman Marcus refused to hire her and discriminated against her based on her credit history claiming a satisfactory credit check is not a *bona fide* occupational requirement for the dress collections sales associate position.

¶ 5     Defendant admitted that Ohle applied for a job and was interviewed, a credit check was ordered, and plaintiff was not hired. Defendant also admitted that Ohle was "provided a contingent offer of employment as a sales associate pending the completion of a successful

---

[1]The trial court did not rule on plaintiff's petition for class certification prior to dismissing this case.

[2]Those seven circumstances are (1) state or federal law requires bonding an individual holding the position, (2) the position's duties "include custody or unsupervised access to cash or marketable assets valued at $2,500 or more," (3) the job duties include "signatory power over business assets of $100 or more per transaction," (4) the job is a managerial position involving setting the direction or control over the business, (5) the "position involves access to personal or confidential information," including financial information, (6) as required by administrative rules promulgated by the United States Department of Labor or Illinois Department of Labor, and (7) the "applicant's credit history is otherwise required by or exempt under federal or State law." 820 ILCS 70/10(b) (West 2012).

background check, including a credit check," and "NMG had elected not to extend her an offer of employment." Defendant admitted that it ordered credit reports for other Illinois sales associates and that it had elected not to extend offers of employment to others based on their credit history. Defendant denied it engaged in any unlawful conduct and denied that class treatment was proper. Defendant also alleged several affirmative defenses, including that a satisfactory credit history is a *bona fide* occupational requirement for the sales associate.

¶ 6        Neiman Marcus is a high-end retailer serving customers with a wide array of designer and luxury merchandise. A sales associate is "responsible for achieving sales goals; provid[ing] outstanding customer service; manag[ing] clientele effectively to achieve financial results; [being an] effective communicator with Department Manager and Coordinator; [and] perform[ing] additional tasks as required." In the dress department, an individual dress can cost more than $1000. Neiman Marcus employs sales associates to sell its merchandise to the public. The sales associates are heavily supervised, both by store managers and loss prevention teams using surveillance cameras. Sales associates are observed from the moment they enter the building until they pass through security checks leaving at the end of the day. Such oversight is in place because at any given time the Oak Brook location has tens of millions of dollars of merchandise in inventory.

¶ 7        Sales associates are paid a minimum hourly rate, or sales commission, whichever is greater. Sales associates process sales and returns of Neiman Marcus's merchandise using point of sale (POS) registers by inputting a personal identification number (PIN) and password. They are allowed to sell merchandise across the entire store floor and are responsible for the cash in their POS registers. Sales associates can authorize cash refunds of up to $100, or they can credit a customer's credit or gift card in greater amounts. They can also accept in-store payments for a customer's Neiman Marcus credit card.

¶ 8        Sales associates are to encourage Neiman Marcus customers to open store credit cards. Neiman Marcus permits all of its employees to accept customer applications for a store credit card. These applications contain customer dates of birth, social security numbers, driver's license numbers, and income amounts. Customers sign the application, authorizing Neiman Marcus's "collection, use, and disclosure" of this information. Neiman Marcus's corporate policy requires all employees to deliver any application received to the credit office or to place them in a locked drawer in the POS register. Employees are specifically prohibited from keeping or accessing any personal customer information from the POS terminals or through any other means. Once the customer's information is digitally entered into the computer system, it is immediately encrypted and sent to a credit card company.

¶ 9        Prior to August 1, 2012, Neiman Marcus required a satisfactory credit check as a condition of employment for its sales associates. However, after August 1, 2012, they eliminated the credit check requirement entirely for its sales associates. Neiman Marcus does continue to run credit checks for certain positions, like loss prevention. Neiman Marcus's vice president of human resources testified that the reason Neiman Marcus no longer performs a credit check for dress collections sales associate applicants is because defendant "was concerned about losing qualified candidates due to failed credit reports, especially with the downturn in the economy."

¶ 10       In September 2013, defendant moved for summary judgment arguing that there are no material facts in dispute and that it didn't hire Ohle for a lawful and legitimate reason, namely, that a satisfactory credit check is a *bona fide* occupational requirement for the sales associate position. Defendant argues that three of the enumerated circumstances in the Act are involved

in the dress collections associate position, and therefore, a satisfactory credit history is a *bona fide* occupational requirement for employment in that position. Those three circumstances are (1) the position involves access to personal or confidential information, (2) the position includes custody of or unsupervised access to cash, or (3) the position includes signatory power of $100 or more per transaction. 80 ILCS 70/10(b)(2), (3), (5) (West 2012).

¶ 11 Defendant's position is that the duties of the sales associate position involve access to personal or confidential customer information because applications for a Neiman Marcus credit card provide the associates with social security numbers, dates of birth, addresses, and income information, which the associates input into the computer. Although applications may be secured with a manager at some point, the associates have access to that confidential information initially and enter that information into an encrypted database in the POS register.

¶ 12 Defendant argued that the duties of the sales associate position involve custody of cash valued at $2500 or more; sales associates routinely sell dresses and items above $2500 of value; purchases can be made with cash, check, or credit card and as long as a purchase is under $10,000, it can be made with any sales associate; and access to personal or confidential information because applications for the Neiman Marcus credit card provide the associates with social security numbers, dates of birth, addresses, and income information, which the associates input into the computer. Although applications may be secured with a manager at some point, the associates have access to that confidential information initially and enter that information into an encrypted database in the POS register. In addition, associates have signatory power of more than $100 because they issue gift cards and process cash returns. Lastly, although Neiman Marcus no longer performs credit checks for sales associate applicants, it is irrelevant from resolving this dispute.

¶ 13 Plaintiff argued that a credit check is not a *bona fide* occupational requirement for this job because the evidence establishes (1) there is supervision of the employees by way of video cameras and associates are closely supervised by on-floor managers; (2) there are policies that limit the amount of cash that can be held in the cash register and handled by sales associates, and according to defendant's loss prevention manager, there are no stores in Illinois with a cash limit exceeding $2500; (3) corporate policy requires that store management, and not associates, perform cash withdrawals for $1000 or more; (4) all employees are permitted to receive store credit card applications and corporate policy requires that all employees, including associates, immediately deliver the applications to the credit office or secure them in a locked POS drawer; (5) associates do not have custody of "Marketable assets," defined by the Act as "company property *** safeguarded from the public and *** only entrusted to managers and select other employees" (820 ILCS 70/5 (West 2012)); (6) associates are prohibited from accessing a customer's personal or confidential information or retaining such information; and (7) associates do not have signatory power over business assets of $100 or more.

¶ 14 The trial court granted defendant's motion for summary judgment finding the sales associate position involves access to personal or confidential customer information, and therefore, the job is exempt from the Act. The trial court found that "[t]he undefined term access is broad and defined without limiting or qualifying language in terms of the type or time of access. The credit card application information to which the sales associate has access meets the statutory definition of personal or confidential information in that it is sensitive information defendant's customers give explicit authorization for defendant to obtain, process and keep."

Because the trial court ruled that the sales associate job is exempt under the Act on this basis, the trial court did not address the two other exemptions raised in defendant's summary judgment motion. Ohle timely filed her notice of appeal on July 2, 2014.

¶ 15                                    ANALYSIS

¶ 16     Summary judgment is appropriate " 'if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Irwin Industrial Tool Co. v. Department of Revenue*, 238 Ill. 2d 332, 339-40 (2010) (quoting 735 ILCS 5/2-1005(c) (West 2008)). The party moving for summary judgment bears the initial burden of proof. *Atanus v. American Airlines, Inc.*, 403 Ill. App. 3d 549, 553 (2010). To survive a summary judgment motion, as the nonmoving party, plaintiff must present a factual basis that would arguably entitle her to a judgment. *Fichtel v. Board of Directors of the River Shore of Naperville Condominium Ass'n*, 389 Ill. App. 3d 951, 956 (2009). We review the trial court's decision to grant summary judgment *de novo*. *Evans v. Brown*, 399 Ill. App. 3d 238, 244 (2010).

¶ 17     The Act (820 ILCS 70/1 *et seq.* (West 2012)) was enacted on January 1, 2011. Pub. Act 96-1426, § 1 (eff. Jan. 1, 2001). The legislative synopsis states that the Act "[p]rohibits employers from inquiring about or using an employee's or prospective employee's credit history as a basis for employment." I Final Legislative Synopsis and Digest of the 96th Ill. Gen. Assem. (No. 14), at 4273. When introducing the Act, Representative Franks explained that "hardworking citizens should not be faced with yet another obstacle to obtaining employment based on the credit history that may be simply a reflection of today's troubled economy." 96th Ill. Gen. Assem., House Proceedings, Mar. 25, 2010, at 184 (statements of Representative Franks). Companies are "discriminating against potential employees based on their credit history, and that's absurd." *Id.* at 185.

¶ 18     The Act exempts certain industries from its reach by providing "exemptions for the banking and financial industry, state law enforcement, and investigation units, and some state government agencies" (*id.* at 184) or those with access to national security information (820 ILCS 70/5 (West 2012)). The purpose of the Act was to prevent citizens who face "financial hardships that are often unpreventable" due to the "harshest economic situation we've seen in decades" to be able to obtain employment despite "bad credit" (96th Ill. Gen. Assem., House Proceedings, Mar. 25, 2010, at 184 (statements of Representative Franks)) where credit history is not relevant to the job (96th Ill. Gen. Assem., Senate Proceedings, May 4, 2010, at 34-35). The Act provides that employers may not:

> "(1) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of the individual's credit history or credit report.
>
> (2) Inquire about an applicant's or employee's credit history.
>
> (3) Order or obtain an applicant's or employee's credit report from a consumer reporting agency." 820 ILCS 70/10(a) (West 2012).

¶ 19     Section 10(b) of the Act provides for exemptions from this prohibition for certain jobs. It reads:

"(b) The prohibition in subsection (a) of this Section does not prevent an inquiry or employment action if a satisfactory credit history is an established bona fide occupational requirement of a particular position or a particular group of an employer's employees. A satisfactory credit history is not a bona fide occupational requirement unless at least one of the following circumstances is present:

(1) State or federal law requires bonding or other security covering an individual holding the position.

(2) The duties of the position include custody of or unsupervised access to cash or marketable assets valued at $2,500 or more.

(3) The duties of the position include signatory power over business assets of $100 or more per transaction.

(4) The position is a managerial position which involves setting the direction or control of the business.

(5) The position involves access to personal or confidential information,[3] financial information, trade secrets, or State or national security information.

(6) The position meets criteria in administrative rules, if any, that the U.S. Department of Labor or the Illinois Department of Labor has promulgated to establish the circumstances in which a credit history is a bona fide occupational requirement.

(7) The employee's or applicant's credit history is otherwise required by or exempt under federal or State law." 820 ILCS 70/10(a) (West 2012).

¶ 20    Defendant moved for summary judgment arguing the exemptions provided in sections 10(b)(2), (3), and (5) apply to the sales associate job, and therefore defendant was permitted to inquire into Ohle's credit history in deciding whether to employ her.

¶ 21    The trial court based its ruling on section 10(b)(5) of the Act which creates an exemption to allow employers to inquire into and use an applicant's credit history as a basis of hiring for a position involving "access to personal or confidential information, financial information, trade secrets or national security information." The trial court reasoned the exemption applied because the term "access" is broad and sales associates receive, as part of their job duties, credit card applications containing confidential information, including names, addresses, and social security numbers, and input that information into their POS registers.

¶ 22    The parties agree that social security numbers and other personal or confidential customer information is contained in completed Neiman Marcus credit card applications. Therefore, the outcome of whether the section 10(b)(5) exemption applies to this case turns on the interpretation of one word: "access."

¶ 23    Plaintiff argues that sales associates merely receive the credit card applications and place them in the cash drawers for delivery to the cash department at the end of the day; whereas,

---

[3]Section 5 of the Act (820 ILCS 70/5 (West 2012)) defines "personal or confidential information" as "sensitive information that a customer or client of the employing organization gives explicit authorization for the organization to obtain, process, and keep; that the employer entrusts only to managers and a select few employees; or that is stored in secure repositories not accessible by the public or low-level employees."

defendant contends the associates input the confidential information into the Neiman Marcus computer system.

¶ 24    Plaintiff argues that in order to constitute "access," an employee would need to be able to read, process, and use the information on the application. For example, loss prevention employees or credit office personnel who process and keep the credit card applications and maintain the customer databases. No evidence in the record supports that sales associates perform any of those duties. Rather the record establishes sales associates are merely conduits that receive the information and turn it over to managers or employees Neiman Marcus entrusts with the information. This type of transmission is not as expansive as required by the term "access."

¶ 25    Defendant contends that "access" is a legal question. Defendant argues that an associate's mere receipt of a credit card application amounts to "access" to confidential information. If defendant is correct that merely receiving an application, keeping it in the POS cash drawer, and later delivering it to the cash office constitute "access" to confidential information under the Act, then the sales associate position would arguably be exempt from the Act's protections.

¶ 26    The term "access" is not defined within the Act, and no Illinois court has construed the meaning of this term. Statutory construction is a question of law, subject to *de novo* review. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 12 (1996). The plain language of a statute is the most reliable indication of legislative intent. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006). "[W]hen the language of the statute is clear, it must be applied as written without resort to aids or tools of interpretation." *Id.* "When interpreting a statute, courts must ' "consider the statute in its entirety, keeping in mind the subject it addresses and the apparent intent of the legislature in enacting it." [Citation.]' " *Nelson v. Artley*, 2015 IL 118058, ¶ 24 (quoting *People v. Allen*, 2015 IL 113135, ¶ 32). We must "consider the relevant provision of the [statute] as a whole" and recognize the statute's "express, undisputed and overriding purpose." *Id.* We do not depart from the plain language of a statute by reading into it exceptions, limitations, or conditions that conflict with the legislative intent. *Harrisonville Telephone Co. v. Illinois Commerce Comm'n*, 212 Ill. 2d 237, 251 (2004).

¶ 27    Our primary objective in construing a statute is to ascertain and give effect to the intent of the legislature. *MidAmerica Bank, FSB v. Charter One Bank*, *FSB*, 232 Ill. 2d 560, 565 (2009). In determining the intent of the legislature, "the court may properly consider not only the language used in a statute, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved." *Stewart v. Industrial Comm'n*, 115 Ill. 2d 337, 341 (1987).

¶ 28    Where a statute is unclear, we may consider legislative history in order to establish legislative intent. *Balmoral Racing Club, Inc. v. Topinka*, 334 Ill. App. 3d 454, 460 (2002). Such extrinsic sources as legislative debates may be relevant to the inquiry. *Morel v. Coronet Insurance Co.*, 117 Ill. 2d 18, 24 (1987). In construing a statute, we also presume that the General Assembly, in its enactment of legislation, "did not intend absurdity, inconvenience or injustice." *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 362-63 (1986); see *Nelson*, 2015 IL 118058, ¶ 27. "Statutes must be construed in the most beneficial way which their language will permit so as to prevent hardship or injustice, and to oppose prejudice to public interests." *Mulligan v. Joliet Regional Port District*, 123 Ill. 2d 303, 313 (1988).

¶ 29    During Illinois Senate 2010 Regular Session No. 119, application of the Act was discussed on the Senate floor:

"SENATOR HUTCHINSON:

Senator Harmon, is it the intention of House Bill 4658 for the use of cash registers or the handling of credit cards by cashiers or other employees during business transactions to be included under the definition of, quote, 'personal or confidential information'?

\*\*\*

SENATOR HARMON:

No, that is not the intent.

\* \* \*

SENATOR RIGHTER:

Thank—thank you, Senator. On that list, so anyone who handles money, regardless of who their employer may be or what that specific occupation is, if they're handling cash or checks as a—as—as part of their regular duties, would that—would that be included as well?

\* \* \*

SENATOR HARMON:

Thank you, Madam President. No. Not in all cases. And I call your attention to page 4, line 20 through 22. "The duties of the position include custody of or unsupervised access to cash or marketable assets valued at twenty-five hundred dollars or more.' As you heard in our discussion on the Floor with Senator Hutchinson, operating a cash register, taking cash from customers at the grocery store, is not intended to be covered by this. We're talking about unsupervised access to cash in a—in a requisite amount under the bill." 96th Ill. Gen. Assem., Senate Proceedings, May 4, 2010, at 35-37 (statements of Senators Hutchinson, Harmon and Righter).

Senator Harmon also explained that "[a]s a matter of public policy, we have decided that there are certain things employers should not consider in making decisions: race, gender, or other \*\*\* factors." 96th Ill. Gen. Assem., Senate Proceedings, May 4, 2010, at 43 (statements of Senator Harmon). This Act adds "one more factor that employers shouldn't consider unless it's relevant to the job" and "I don't think we're imposing undue burden on employers." *Id.*

¶ 30   First, we see no meaningful distinction between being handed a credit card, which contains a customer's private credit card number, to swipe or type its number into the POS register and return to the customer, and receiving a credit card application, which also contains a customer's private information, securing it in the register, and later turning it over to a manager. The only obvious distinction is the amount of time a sales associate may have the credit card and the application in his or her possession.

¶ 31   The statute defines personal or confidential information as "sensitive information that a customer or client of the employing organization gives explicit authorization for the organization to obtain, process, and keep; that the employer entrusts only to managers and a select few employees; or that is stored in secure repositories not accessible by the public or low-level employees." 820 ILCS 70/5 (West 2012).

¶ 32   Plaintiff points to the deposition of defendant's vice president of loss prevention who testified that sales associates only have "access" to customer social security numbers and other confidential information when the "new credit card application is submitted." A customer hands his or her completed credit card application to the sales associate who inserts it into the

cash drawer and later turns it in to the cash department. A sales associate may input some customer information into a POS register, but the associate does not have access to the social security number. Associates only have access to the customer's name, address, and phone number. Neiman Marcus stores the customer information in a computer system to which sales associates do not have access. Only the loss prevention manager or credit department would have access to that kind of information. In addition, it is against corporate policy for sales associates to copy a customer's confidential information or access it after the credit card account is opened.

¶ 33    Defendant argues the undisputed facts establish that sales associates have "access" to confidential customer information when they receive the completed applications and input that information in the POS registers. Defendant asserts that its vice president of loss prevention testified that sales associates have "access" to customer social security numbers and other confidential information when "opening a new credit card" and that after the account is opened associates no longer have access to that information. Defendant argues that plaintiff's framing of an associate's role as merely a "delivery system" without access to the information is "factually incorrect" because "delivery cannot be possible without access."

¶ 34    In reviewing the record, the parties' briefs, and the discovery on file, we find that sales associates are neither managers nor the select few employees whom Neiman Marcus trusts with personal and confidential information so as to exempt the sales associate position from the protections of the Act. Defendant's human resources manager testified at her deposition that, when a sales associate receives a credit card application, it "need[s] to be put into a secured slot underneath the POS terminal, and then at the end of the day, any kind of private information like that, applications for credit card checks that people written or anything else that's handed to the associate that has any private information on it goes into a red bag, and the red bag gets taken up to the cash credit office in the store at closing time." In fact, "[t]here are only certain people who would have access to that information [*i.e.*, date of birth, address, and social security number,] once the account is processed." Only management in the corporate office would be able to see that information. After that information is turned in, sales associates do not have access to it.

¶ 35    John Marazio, vice president of human resources, testified that customers may apply for a credit card online or they may complete a hard copy application. Sometimes customers complete the forms themselves and sometimes they ask associates to do it for them. If an associate receives a hard copy application they are to "[e]nter it into the POS system" so the credit account can be approved on the spot. The hard copy is secured by the associate and later taken to the cash office. In his opinion, sales associates have access to private customer information in the application "[b]ecause they receive the hard copy" and "bring it into the customer service office." The only way an associate would continue to have access to the private information after it was turned in is if the associate retained a copy of the application.

¶ 36    John Phillips, defendant's vice president of loss prevention, testified that employees "[f]rom a sales associate level" cannot "go into any Neiman Marcus database or computer systems" in order to access a customer's social security number. When a sales associate is handed a credit card application they are "encouraged to bring it to the case office, but from a service standpoint, I believe they would just insert that into *** the cash drawer and *** bring it at *** either a later time or when they close for business." After turning in the application,

sales associates do not have access to customer social security numbers and other personal financial information.

¶ 37    In other words, defendant's employees testified that only its managers or select few employees—not low-level employees—are entrusted with the confidential information the customer gave the store with the explicit authorization to process and keep. Neiman Marcus requires the sales associates keep the applications locked in their cash drawer until the end of the work day or immediately give them to a manager. Only managers and credit office and loss prevention employees can see the customer information in the computer database and can obtain, keep, or process that information. In sum, Neiman Marcus does not permit sales associates to do any of the above. A sales associate essentially acts as a conduit by (1) receiving the application from the customer, ensuring it gets to Neiman Marcus manager or trusted employee, or (2) entering the information into the POS system for immediate credit approval, which is a task no more sensitive in nature than entering credit card numbers into a credit card machine or taking down driver's license information to accept a personal check in order to complete a sales transaction. This is precisely what Senator Harmon explained when discussing the intent of the Act and the purview of this exception. Therefore, we find it is Neiman Marcus managers and a select few employees (credit office personnel and loss prevention) who have "access" to personal and confidential customer information as contemplated by section 10(b)(5) and not Neiman Marcus dress collection sales associates.

¶ 38    When a literal interpretation of a statutory term would lead to consequences that the legislature could not have contemplated and surely did not intend, this court will give the statutory language a reasonable interpretation. *In re Marriage of Eltrevoog*, 92 Ill. 2d 66, 70-71 (1982) (citing, *inter alia*, 2A Norman J. Singer, Sutherland on Statutory Construction § 45.12 (4th ed. 1973)). A statute should be interpreted so as to promote its essential purposes and to avoid, if possible, a construction that would raise doubts as to its validity. *Morton Grove Park District v. American National Bank & Trust Co.*, 78 Ill. 2d 353, 363 (1980).

¶ 39    We agree with plaintiff's contention that if the sales associate position under review was exempt from the Act, the "exemption would swallow the rule"; if "access" were construed in such a broad manner, the Act would in effect accomplish nothing and fail to protect the majority of retail sales clerks. If the Act applied where employees are simply handed credit card applications and then place the application in a drawer for processing at a later time by a different department, then retail clerks in most stores, including retail stores like defendant's, would be exempt and employers would be allowed to deny employment to citizens who face "financial hardships that are often unpreventable" due to the "harshest economic situation we've seen in decades" and who are not able to obtain employment because of "bad credit." 96th Ill. Gen. Assem., House Proceedings, Mar. 25, 2010, at 184 (statements of Representative Franks).

¶ 40    If the extent of a sales associate's "access" to an application is merely securing it in the register and taking it to the cash office, then it is clear from the legislative history that this broad interpretation of the exemption is not what the legislature intended. As clearly indicated by Representative Franks and Senator Harmon, the legislative purpose behind the Act is to help those who have fallen on hard times find employment, and the Act does not apply to those employees performing simple tasks at cash registers. The Act aims to do this by prohibiting employers from considering the potential employee's credit history unless it is "an established bona fide occupational requirement of a particular position." 820 ILCS 70/10(b) (West 2012).

Section 10(b)(5) exempts employees from protection under the Act when the "position involves access to personal or confidential information, financial information, trade secrets, or State or national security information." 820 ILCS 70/10(b)(5) (West 2012). In the context of this case, "access" to credit application information would pertain to the employees that process the credit application, receive the customer's credit report, analyze the customer's detailed financial history, and make the decision on whether to extend credit. There is nothing in this record that any of that type of detailed credit information is made available to or is accessible to sales associates selling dresses for defendant. To construe "access" to personal or confidential information so broadly as to include merely accepting credit card applications by an entry-level employee applying for this type of position nullifies the legislative intent evident in this Act. All Neiman Marcus employees are permitted to accept the store credit card applications, and in that sense, all employees have "access" to the information contained therein. Only a select group of Neiman Marcus employees in the loss prevention, customer service, and the credit department have access to credit card applications after they were submitted, and only employees in those departments can access the encrypted customer information obtained from further processing of the customer's credit history. Those are the types of positions that the legislature contemplated as having "access" to personal or confidential information subject to section 10(b)(5) of the Act, not the type of position plaintiff sought.

¶ 41    Although not addressed by the trial court, defendant urges this court to consider the two other exemptions it raised in its summary judgment motion as grounds for affirming summary judgment. Because our review is *de novo* and the record is clear, we will address defendant's contentions. In its motion for summary judgment, defendant argued that as part of the dress collection sales associate position, two other circumstances exist that exempt the job from the Act, namely, (1) sales associates at times have custody of cash valued at $2500 or more (820 ILCS 70/10(b)(2) (West 2012)) and (2) associates have signatory power over business assets of $100 or more per transaction (820 ILCS 70/10(b)(3) (West 2012)). In its reply brief, plaintiff argues that these two circumstances do not apply to the sales associate position and, at the very least, a factual dispute exists as to whether associates ever have custody of cash valued at $2500 or more or signatory power over business assets totaling $100 or more.

¶ 42    Section 10(b)(2) provides that if the "duties of the position includes custody of or unsupervised access to cash or marketable assets valued at $2,500 or more," then an employer is permitted to inquire into an applicant's credit history or refuse to hire an applicant based on their credit history. 820 ILCS 70/10(b)(2) (West 2012). We find that the exemption in section 10(b)(2) of the Act does not apply to the dress collection sales associate position.

¶ 43    The Act defines marketable assets as

> "company property that is specially safeguarded from the public and to which access is only entrusted to managers and select other employees. For the purposes of this Act, marketable assets do not include the fixtures, furnishings, or equipment of an employer." 820 ILCS 70/5 (West 2012).

Senator Harmon was clear that "operating a cash register, taking cash from customers at the grocery store, is not intended to be covered by this [Act]. We're talking about unsupervised access to cash in a—in a requisite amount under the bill." 96th Ill. Gen. Assem., Senate Proceedings, May 4, 2010, at 38 (statements of Senator Harmon).

¶ 44    Here, sales associates, like cashiers at a grocery store, process retail transactions at a cash register for varying amounts. The purchases they handle at their cash registers are not "company property specially safeguarded from the public and to which access is only entrusted to managers and select few employees." The merchandise is open and available to the public on the sales floor. The record establishes that Neiman Marcus sales associates are monitored by floor managers and live real-time surveillance. Managers supervise the sales associates, and video cameras record the activity on the sales floors. Defendant's vice president of loss prevention testified at his deposition that the opening amount kept in a register is $200. That amount may vary depending on sales throughout the day, but he is unaware of any Illinois store that has a cash limit of $2500 or more. Furthermore, defendant explained in an interrogatory response that Neiman Marcus's "official Corporate policy states that a cash withdrawal should be done when a register has cash in excess of $1,000 or another amount established by management," and defendant's assistant human resources manager testified that sales associates do not have "access to non-public financial information for Neiman Marcus." Therefore, it is clear and without doubt that dress collection sales associates do not have unsupervised access to cash valued at $2500 or more, and thus, section 10(b)(2) does not apply to exempt this job from the Act's prohibitions.

¶ 45    Section 10(b)(3) provides another exemption from the Act if the "duties of the position include signatory power over business assets of $100 or more per transaction." 820 ILCS 70/10(b)(3) (West 2012). Defendant contends that because sales associates log in to the POS registers to issue refunds for more than $100 in cash or gift cards valued at $100 or more, sales associates have signatory power over $100 or more of Neiman Marcus's business assets. Plaintiff argues that a sales associate's authority to issue cash refunds or gift cards to complete a customer's transaction is not equivalent to having "signatory authority" over Neiman Marcus's business assets. We agree with plaintiff.

¶ 46    When discussing this exemption Representative Franks referenced an exemption for "any bank holding company, bank, savings bank, savings and loan, a credit union, or trust company" and then explained that "anyone that's handling the money, those people are not going to be exempt" under section 10(b)(3) of the Act. 96th Ill. Gen. Assem., House Proceedings, Mar. 25, 2010, at 191-92 (statements of Representative Franks). Black's Law Dictionary defines "signatory authority" as a "[l]icense to make a decision, esp. to withdraw money from an account or to transfer a negotiable instrument." Black's Law Dictionary 1593 (10th ed. 2014). A common sense interpretation of this exemption is that "anyone that's handling the money," *i.e.*, withdrawing money from the employer's bank account or issuing checks for the employer, refers to employees dealing with the employer's finances, *e.g.*, accountants, accounts receivable and payable clerks, managers, and loss prevention associates. The Act was intended to protect sales clerks regardless of whether they applied for a position in a neighborhood retail store or a high-end retail establishment selling expensive consumer goods like defendant. Thus, we conclude that accepting defendant's argument would create an almost limitless exemption that would apply to virtually all cash register operators, contrary to the intent of the Act. By refunding a customer's money in return for a Neiman Marcus item or by issuing a gift card in exchange for money, a sales associate is simply performing duties as a cashier, and therefore, the exemption applicable to those with signatory power over $100 or more of defendant's business assets is not a *bona fide* occupational requirement of the dress collection sales associate position at defendant's business.

¶ 47    In sum, we find defendant has not maintained its burden of proof that an exemption to the Act applies to the dress collection sales associate position, and therefore, its admitted discrimination against plaintiff when applying for that job because of her low credit score was not permitted under the Act. We note that plaintiff did not file a cross-motion for summary judgment in the circuit court. Accordingly, we cannot enter judgment on the merits in plaintiff's favor at this juncture, notwithstanding our determination that defendant's admitted discrimination of plaintiff was not permitted under the Act. See *Schnabel v. County of Du Page*, 101 Ill. App. 3d 553, 563 (1981). We can only reverse and remand for further proceedings consistent with this opinion. See *Rainey v. Indiana Insurance Co.*, 2016 IL App (1st) 150862-U.

¶ 48                                   CONCLUSION

¶ 49    For the foregoing reasons, we reverse the judgment of the circuit court and remand for further proceedings consistent with this opinion.

¶ 50    Reversed and remanded.